## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

CHRISTINE ALBERS, RICHARD AND
MARYLOU BARROW, ASHLEY
CHILDS, THOMAS DOWNS, JOE
FASOLO, ROSEMARY FASOLO, ROBIN
LEAGER, DONALD MARKS, FRANCES
MURN, THOMAS NORRIS, DEAN
O'DONNELL, FELICIA O'DONNELL,
BRENDA GULRICH, MATHEW
GULRICH, STANLEY SETTLE, LISA
SETTLE, SUSAN CECALA, TREVOR
MAYHEW, MARIA COHEN, MICHAEL
SZPARAGA, MARVIN SANDLER,
DIANE SANDLER, HELEN MCAULIFFE,
NICOLE BARON, and ALAINE PATTON,

CASE NO.: 6:16-CV-1713-ORL-18-DAB
JUDGE:

Plaintiffs,

vs.

COMMONWEALTH CAPITAL CORP.,
COMMONWEALTH INCOME AND
GROWTH FUND, INC., COMMON-
WEALTH CAPITAL SECURITIES CORP.
and KIMBERLY SPRINGSTEEN-
ABBOTT, individually,

Defendants.

_____/

## COMPLAINT

PLAINTIFFS, CHRISTINE ALBERS, RICHARD AND MARYLOU BARROW,

ASHLEY CHILDS, THOMAS DOWNS, JOE FASOLO, ROSEMARY FASOLO,

ROBIN LEAGER, DONALD MARKS, FRANCES MURN, THOMAS NORRIS,

DEAN O'DONNELL, FELICIA O'DONNELL, BRENDA GULRICH, MATHEW

GULRICH, STANLEY SETTLE, LISA SETTLE, SUSAN CECALA, TREVOR

MAYHEW, MARIA COHEN, MICHAEL SZPARAGA, MARVIN AND DIANE SANDLER, HELEN MCAULIFFE, NICOLE BARON, and ALAINE PATTON (collectively referred to as **"Plaintiffs"**), by and through their undersigned counsel, bring this claim against Defendants, COMMONWEALTH CAPITAL CORP., COMMONWEALTH INCOME AND GROWTH FUND, INC. (the "Fund" or "CIGF"), COMMONWEALTH CAPITAL SECURITIES CORP. and KIMBERLY SPRINGSTEEN ABBOTT, individually (collectively referred to as **"Defendants"** or **"Commonwealth"**) and in furtherance thereof state as follows:

## VENUE AND JURISDICTION

1.      Plaintiff, Christine Albers is an individual domiciled in Lynchburg, Virginia, and at all times material hereto, was an investor with Commonwealth.

2.      Plaintiffs, Richard and Marylou Barrow are individuals domiciled in Easton, Maryland, and at all times material hereto, were investors with Commonwealth.

3.      Plaintiff, Ashley Childs is an individual domiciled in Savannah, Georgia, and at all times material hereto, was an investor with Commonwealth.

4.      Plaintiff, Thomas Downs is an individual domiciled in Centreville, Maryland, and at all times material hereto, was an investor with Commonwealth.

5.      Plaintiff, Joe Fasolo is an individual domiciled in St. Michaels, Maryland, and at all times material hereto, was an investor with Commonwealth.

6.      Plaintiff, Rosemary Fasolo is an individual domiciled in St. Michaels, Maryland, and at all times material hereto, was an investor with Commonwealth.

7.      Plaintiff, Robin Leager is an individual domiciled in Centreville, Maryland, and at all times material hereto, was an investor with Commonwealth.

8.      Plaintiff, Donald Marks is an individual domiciled in Baltimore, Maryland, and at all times material hereto, was an investor with Commonwealth.

9.      Plaintiff, Frances Murn is an individual domiciled in Easton, Maryland, and at all times material hereto, was an investor with Commonwealth.

10.     Plaintiff, Thomas Norris is an individual domiciled in McDaniel, Maryland, and at all times material hereto, was an investor with Commonwealth.

11.     Plaintiff, Dean O'Donnell is an individual domiciled in Cordova, Maryland, and at all times material hereto, was an investor with Commonwealth.

12.     Plaintiff, Felicia O'Donnell is an individual domiciled in Cordova, Maryland, and at all times material hereto, was an investor with Commonwealth.

13.     Plaintiff, Brenda Gulrich is an individual domiciled in Marydel, Maryland, and at all times material hereto, was an investor with Commonwealth.

14.     Plaintiff, Mathew Gulrich is an individual domiciled in Marydel, Maryland, and at all times material hereto, was an investor with Commonwealth.

15.     Plaintiff, Stanley Settle is an individual domiciled in Ashburn, Virginia, and at all times material hereto, was an investor with Commonwealth.

16.     Plaintiff, Lisa Settle is an individual domiciled in Ashburn, Virginia, and at all times material hereto, was an investor with Commonwealth.

17.     Plaintiff, Susan Cecala is an individual domiciled in Falls Church, Virginia, and at all times material hereto, was an investor with Commonwealth.

18.     Plaintiff, Trevor Mayhew is an individual domiciled in Newport News, Virginia, and at all times material hereto, was an investor with Commonwealth.

19.     Plaintiff, Maria Cohen is an individual domiciled in Boynton Beach, Florida, and at all times material hereto, was an investor with Commonwealth.

20.     Plaintiff, Michael Szparaga is an individual domiciled in Hobe Sound, Florida, and at all times material hereto, was an investor with Commonwealth.

21.     Plaintiffs, Marvin and Diane Sandler are individuals domiciled in Delray Beach, Florida, and at all times material hereto, were investors with Commonwealth.

22.     Plaintiff, Helen McAuliffe is an individual domiciled in Palm Beach Gardens, Florida, and at all times material hereto, was an investor with Commonwealth.

23.     Plaintiff, Nicole Baron is an individual domiciled in Boynton Beach, Florida, and at all times material hereto, was an investor with Commonwealth Capital Securities Corp.

24.     Plaintiff, Alaine Patton is an individual domiciled in Canton, Michigan, and at all times material hereto, was an investor with Commonwealth Capital Securities Corp.

25.     Defendant, Commonwealth Capital Corp. is an equipment leasing and financial services company domiciled in Clearwater, Florida.

26.     Commonwealth Capital Securities Corp. ("Commonwealth Securities" or the "Broker-Dealer") is a broker-dealer domiciled in Clearwater, Florida and owned by Commonwealth Capital Corp.

27.     Defendant, CIGF is a General Partnership which manages equipment leasing funds sponsored by its parent company Commonwealth Capital Corp. CIGF is domiciled in Clearwater, Florida.

28.     Defendant, Kimberly Ann Springsteen-Abbott ("Springsteen-Abbott") was at all relevant times, the Chief Executive Officer and/or controlled Commonwealth Capital Corp., Commonwealth Securities and CIGF.    Springsteen-Abbott is domiciled in Holiday, Florida.

29.     This Court has subject matter jurisdiction pursuant to §27 of the 1934 Act.  The claims asserted herein arise under 15 USC §78j(b) and 17 CFR §240.10B-5, and 15 USC §77l(2) §12(2).

30.     The Court exercises personal jurisdiction over Defendants because, among other things, (1) they are domiciled in and therefore citizens of Florida; (2) they maintain the requisite minimum contacts with Florida; (3) operate, conduct, engage in and carry on business in Florida; and, (4) engage in substantial and not isolated activity in Florida.

31.     Venue is proper in this judicial district pursuant to §28 USC 1391(b).

## GENERAL ALLEGATIONS

32.     This Complaint concerns specifically Commonwealth Income and Growth Funds 1, 2, 3, 4, and 5.   While the various claims will be illustrated through Commonwealth Income and Growth Fund 5 ("CIGF5"), the records will show that the same or similar allegations will be proven with respect to Funds 1-4.   The Plaintiffs purchased the following amounts of the respective Fund as set forth below:

| Name | Amount | Fund |
|---|---|---|
| Christine Albers | $50,000 | 5 |
| Richard and Marylou Barrow | $142,000 | 5 |
| Ashley Childs | $200,000 | 3 |

| | | |
|---|---|---|
| Thomas Downs | $30,000 | 5 |
| Jose Fasolo | $90,000 | 3 |
| Rosemary Fasolo | $30,000 | 3 |
| Robin Leager | $10,000 | 5 |
| Donald Marks | $40,000 | 3 |
| Frances Mum | $50,000 | 5 |
| Thomas Norris | $70,000 | 5 |
| Dean O'Donnell | $18,000 | 5 |
| Felicia O'Donnell | $18,000 | 5 |
| Brenda Gulrich | $10,000 | 5 |
| Matt Gulrich | $10,000 | 5 |
| Stanley and Lisa Settle | $50,000 | 5 |
| Susan Cecala | $5,000 | 5 |
| Trevor Mayhew | $100,000 | 1 |
| Maria Cohen | $150,000 | 2 |
| Michael Szparaga | $175,000<br>$150,000 | 1<br>5 |
| Marvin and Diane Sandler | $100,000 | 4 |
| Helen McAuliffe | $100,000 | 1 |
| Nicole Barron | $100,000 | 2 |
| Alaine Patton | $100,000 | 5 |

33.     CIGF5 sought to raise a maximum of $25,000,000 beginning in February 2005 and ending in February 2006. See Prospectus (attached hereto as **Ex. "A"**). According to the Offering Summary for CIGF5 (attached hereto as **Ex. "B"**), CIGF5 was formed "to acquire technology leases from a wide range of Fortune 1000 and credit worthy companies across the country". The offering summary further states that the liquidation phase would be at years 9 and 10. This offering was not limited to accredited investors but, rather, individuals with a net worth of $45,000 (net of home) and gross income of $45,000 or a net worth of $150,000.

34.     As with other CIGF Funds, CIGF5 was offered for sale to the public through various brokerage firms with CIGF5 acting as a "wholesaler". Commonwealth employed an individual, Chip Mason, who made presentations to solicit the purchase of CIGF5 to both brokers and their respective customers. The Plaintiffs in this case were customers of one of three brokers, (1) Matt Albers, (2) Mike Nixon or (3) Jeffrey Sanders.

35.     The presentations, which were approved by Springsteen-Abbott, emphasized certain attributes of CIGF5. Specifically, the leases were intended to generate income with the principal investment being returned in years 8-10. Moreover, investors would be able to redeem their investment after the requisite holding period, albeit, at a somewhat reduced portion of their original principal investment. These and other representations proved not to be true.

36.     Customers completed a Subscription Agreement (a sample of which is attached as **Ex. "C"**), in connection with their purchase of limited partnership interests in CIGF5, but were instructed to send their checks to Commonwealth Securities.

## LIFE CYCLE

37.     As reflected in the frequently asked questions section of the CIGF5 Offering

Circular (see attached **Ex. "D"**) the program life cycle is described as follows:

> There are three stages to the Fund.  The first stage is known
> as the "offering period".   In the offering period, we raise
> money from investors and buy equipment leases for the
> Fund.   The second stage is the "reinvestment or operating
> period" where leases are bought and sold and the portfolio is
> actively   managed.      This   phase   is   structured   to   last
> approximately 8 years.    The last stage is the "liquidation
> phase."     During   liquidation,   which   is   structured   to   last
> approximately 1-2 years, equipment is sold in an orderly
> fashion, as leases expire.  As the equipment is sold, proceeds
> are distributed proportionately to investors.  None of our four
> prior funds have gone full cycle to date.

38.     Further, pursuant to the Prospectus (Ex. A) the CIGF5 "will begin to dispose of

its equipment approximately nine years after completion of this offering".  To date, no

distributions as set forth in the CIGF5's sales documents have taken place.

39.     One of the reasons that the liquidation phase occurs over a two-year period is

that distributions are made as leases come due.  Therefore, the average length of

leases should diminish as the liquidation phase is reached.  In the case of Fund, the

opposite was true.

40.     The Average term of active leases increased from 33 months at the end of June

2013 to 36 months at the end of September 2013.  (See CIGF5 Updates, **Ex. "E"**).   By

March 31, 2015, the average term of active leases had increased to 39.26 months.  See

3/31/15 CIGF5 Update (Ex. E).   A lengthening of the term of the leases, as the

liquidation phase is reached, is inconsistent with an orderly wind down of CIGF5.   At

the least, the failure of CIGF5 to begin to repay investors is indicative of the negligent or incompetent management of CIGF5's assets.

41.    To emphasize the extent of the mismanagement of the Fund, on September 7, 2015, investors received a letter enclosing a "Notice of Special Meeting and Proxy Statement for a Special Meeting of the Partners of the Partnership" to be held on October 28, 2015 (See **Ex. "F"**)   The purpose of the meeting is to "propose an amendment to the limited partnership agreement (the "Agreement") that will authorize a three year extension of the operational phase to December 31, 2020, and two years to liquidate the Partnership".   The investors were being asked to approve this extension without an understanding of the equity or true value of CGIF5 or any cogent explanation as to the economic benefit to the investors to vote in favor of the extension.

42.    In the Proxy, the investors are simply told that the extension is necessary due to "below par performance, due to a number of factors, such as lease payment receivables issues, equipment repossessions and long term litigations".   Yet, of the four enumerated deals, which are cited as reasons for CIGF5's poor performance, the most recent is 2010.   This hardly explains the need to extend the Partnership out until 2022.   Seeking through a proxy vote to extend the life of CIGF5 out these additional years only serves to generate additional, unwarranted fees to CIGF5 while masking the true nature and extent of the problems; essentially "kicking the can down the road".   The failure to disclose the remaining equity of the CGIF5 investors has been a material concealment.   In addition, based on knowledge and belief, the proposed amendment in

the Proxy to extend the operational phase was not approved, however, it appears that CIGF5 is operating on the basis that it was approved.

## DIVERSIFICATION

43.     Pursuant to the Prospectus (Ex. A), "Diversification is desirable to minimize the effects of changes in specific industries, local economic conditions or similar risks." Further, the Prospectus indicates that "CIGF5's business strategy is to acquire computer peripheral leases, that are leased to investment grade domestic lessees. Our strategy for diversification is through equipment type, leases, lease maturities and industries of lessees" and "during the operational stage of CIGF5, we may not at any one point in time lease more than 25% of the equipment, to a single person or affiliated group of persons."

44.     CGIF5 discontinued paying its dividend after March 2011, purportedly due to problems cited by CIGF5 with leases to Chrysler, Mobil Pro and Oce.  That leases to only three companies could have had such a profoundly negative effect on CIGF5 causing it to discontinue its dividend is demonstrative of a lack of diversification. Moreover, in a letter to Plaintiffs, Mr. and Mrs. Barrow, from Commonwealth's general counsel, Christopher Anderson, dated April 11, 2014, the Barrows were told that the dividend from CIGF5 was suspended, "in order to restore the lost equity in the Fund". (See **Ex. "G"**).  It does not appear, however, that the equity in CIGF5 has appreciably increased, notwithstanding the retention of the dividend for several years.

45.     Moreover, the diversification of CIGF5 did not improve over time.  As of September 2013, 78.65% of all leases were in only three industries: Transportation

Equipment Manufacturing, Food Manufacturing and Administrative and Support Services. (Ex. E ). Contrary to the representations in the Prospectus, close to 40% of all leases were below investment grade. (Ex. E). These figures were disclosed to brokers by the Fund through a quarterly "Fund Update" – which was for "Broker/Dealer Use Only" (Ex. E).

46.     The 2013 Annual Report available to investors portrays a very different story. That document, attached as Exhibit H, states that the risk level of the leases in CIGF5 as of December 31, 2013, was 100% "Moderate to Low [Risk]". The basis for CIGF5s representation to investors that 100% of the leases were moderate to low risk when some 40% were below investment grade is difficult to fathom.

47.     In addition, as of December 31, 2013, 42% of lease revenue came from one company, Cummins, Inc. and 64% of lease revenue came from just two companies; 87% of lease income receivables were attributable to four companies. (See **Ex. "H"**).

48.     As of March 31, 2015, 95.74% of all leases were with five companies and 61.91% with just one company.  As of the end of March 2015, 44.96% of all leases were with less than investment grade companies.  (See **Ex. "I"**).

### RETURN OF CAPITAL

49.     According to the Prospectus:

> "If all of the net proceeds of this offering are not invested by CIGF5 in equipment or committed to such investment or otherwise utilized for proper partnership purposes prior to the expiration of 12 months from the completion of this offering, the net proceeds not so invested, committed, or set aside as working capital, reserves will thereupon be promptly returned to the limited partners with a proportionate share of interest at the rate

earned by CIGF5 on the investment of such proceeds, based upon
their respective number of units and time of purchase."

50.    As set forth in an e-mail from Commonwealth's general counsel, Christopher

Anderson, to Matt Albers on August 20, 2013 (See **Ex. "J"**), of the $21,025,000 raised

by CIGF5 net of fees and costs, $16,700,000 had been invested one year after CIGF5

had closed.

51.    It is acknowledged that CIGF5 is entitled to keep funds to the extent that there

are written agreements in principal, commitment letters, letters of intent or similar

contracts or understandings in place in February 2007.  Based on this scenario, however,

the Fund would have needed contracts and/or commitments of some $4,325,000 by

the end of February 2007.   Based on knowledge and belief, such was not the case.

52.    Over the course of some two to three years, from 2013 through the beginning of

2016, Matt Albers had numerous verbal and written communications with various

employees of Commonwealth, including their General Counsel and CEO.  Alber's efforts

were in furtherance of understanding the status of the CIGF5 including when its dividend

would be reinstated and the investors equity in CIGF5.

## VALUE OF EQUITY

53.    One of the challenges for investors in CIGF5 has been to obtain a clear and

accurate understanding of the value of their investment.   A common measure used by

CIGF5 is the present value or "PV" which is described in Ex. E as follows:

> "The value today, expressed as a percentage of original
> equipment cost, of the leases' rental payment/debt
> discounted by the appropriate interest rate".

54.     As set forth in an e-mail from David Riggleman to Matt Albers dated July 18, 2013 (See **Ex. "K"**), the PV for Fund 5 was 84.24%. In the "Fund Update" dated March 31, 2015 (Ex. 1), the "Average Present Value" of Fund 5 was stated to be 87.73%. In a letter from the CEO, Springsteen-Abbott, to investors on April 29, 2014 (See **Ex. "L"**) the net proceeds available for investment was stated as $20,986,576; the "average present value of rent" was 87.73%.   Would it not seem reasonable to presume that the net proceeds available for investment of $20,986,576 is equity?

55.     Yet, in a letter from Christopher Anderson to the undersigned dated May 29, 2014, he writes:

> "When present value was discussed, it was that of the average lease stream in each lease transaction, not of the Fund. We would have never represented that the present value of the Fund was that high, after the challenges it has experienced".

56.     Notwithstanding such "clarifications", the description of the value of CIGF5 to investors has consistently been inherently misleading. The CEO could have stated the "present value" by simply telling investors the present value in dollars; or, better yet, the equity of the Fund. To confuse matters even further, the CEO's letter (Ex. L) tells investors that "cumulative residual realization of asset disposition is 110.48% and cumulative return of equity is 123.62%", without any explanation of what those items actually mean.

57.     Further evidence of CIGF5's misrepresentation of its value is seen in the accounts of Plaintiffs who had purchased CIGF5 in their Individual Retirement Accounts (IRA's).

58.     In the case of IRA's, the "Clearing" firm looked to the Fund to supply the appropriate price of the investment to be reflected on the customer's monthly account statement.  One of the Plaintiffs, Tom Norris, purchased $70,000 of CIGF5 in his IRA.  Select pages from his IRA monthly account statements which reflect the pricing of CIGF5 are attached. (See **Ex. "M"**).  As reflected in Ex. M, as of December 31, 2012, CIGF5 was priced at $15 for a value of $52,000.  As of December 31, 2013, the price had dropped to $12 and a value of $41,760.  The price on Mr. Norris' statement through at least October 2015, remained at $12.  In March 2016, just five months later, the price had dropped to $2 for a value of $6960.  Clearly, given Christopher Anderson's comments as to PV, Springsteen's overly positive and optimistic statements and the desire to get the investors to vote to extend CIGF5 for another five or six years, the Fund had maintained an unduly inflated value with the intent to mislead the Plaintiffs into believing that their investment was worth more than was actually the case.

## CEO BARRED FROM SECURITIES INDUSTRY

59.     The foregoing should be considered in light of the recent regulatory sanctions against the Commonwealth Funds and their CEO, Kim Springsteen-Abbott.  In September 2013, the SEC announced a cease and desist proceeding which was summarized as follows:

> From 2006 through 2011, CIGF made misleading disclosures concerning the expenses that it charged to nine equipment leasing funds that were sponsored by CIGF's parent company (the "Commonwealth Funds" or the "Funds").  CIGF represented in the Funds' offering documents, which were reviewed and approved by its chief executive officer ("CEO") Springsteen-Abbott, that the salary expenses of CIGF's and its parent's

"Controlling Persons" would not be charged to the Funds. The offering documents describe ten to fifteen individuals for each Fund that serve as directors or executive and senior management for CIGF and its parent. The offering documents further describe the various functions and activities of these individuals and refer to them as CIGF's key management and the persons responsible for making all of the Funds' investment decisions. CIGF and Springsteen-Abbott negligently failed to disclose that she was the sole Controlling Person under their interpretation of the definition and that CIGF and its corporate parent routinely expenses a portion of the salaries of all other employees, executive officers, and directors to the Commonwealth Funds. Each Fund's documentation and each public Funds' Forms 10-K and 10-Q filed with the Commission between 2006 and 2011 disclosed and aggregate amount of reimbursable expenses charged to the Funds, including all salaries charged to the Funds; however, the documentation and filings did not break down those expenses charged to that Fund included a portion of the salaries of all CIGF employees, executive officers, and directors other than its CEO.

60.     In addition to the cease and desist, Commonwealth and Springsteen-Abbott were ordered to disgorge $1,548,688, pay prejudgment interest of $77,566 and pay a civil penalty of $150,000.

61.     On March 30, 2015, a FINRA hearing Court rendered a decision which barred Springsteen-Abbott from any association with any FINRA member in any capacity, and levied fines and disgorgement of over $300,000.

62.     In a 67 page decision (See **Ex. "N"**) the Hearing Court spelled out in considerable detail Springsteen-Abbott's transgressions. The conduct is summarized in the decision as follows:

Springsteen-Abbott abused her authority by improperly allocating to the Funds two types of expenses that were not related to the Funds' business: personal expenses and Broker-Dealer expenses. The practice of charging

personal expenses to the Funds was a way of life for Springsteen-Abbott and her husband, Hank Abbott. They regularly charged thousands of dollars of personal expenses on the same American Express credit card that they used for business expenses, and then, when she received the monthly American Express bill, Springsteen-Abbott allocated to the Funds many of those personal expenses. The personal expenses improperly charged to the Funds included expenses related to a birthday cruise to Alaska, a Mother's Day meal at Longwood Gardens, a Disney family vacation, a Thanksgiving dinner, a post-Christmas family dinner on a trip to New York, and, on a regular basis, more modest family meals. Springsteen-Abbott also improperly allocated to the Funds expenses for holiday decorations for her home, car rentals for cars that her husband used for personal purposes, clothes, accessories, and pharmacy and grocery expenses.

Springsteen-Abbott provided business justifications to FINRA staff for some of the expenses allocated to the Funds. Many of these business justifications were not credible; others were demonstrably false…

…The improper allocation to the Funds of expenses that were unrelated to the Funds' business was unethical and falls well within the proscription of FINRA Rule 2010. It was a misuse of money belonging to investors in the Funds.

63.    Yet, notwithstanding the FINRA Hearing Court's findings, Springsteen-Abbott has continued in her role as CEO of the Commonwealth group of companies, pending the outcome of her appeal of the Hearing Court's decision.

## CAUSES OF ACTION

## COUNT I – BREACH OF CONTRACT

64.     Plaintiffs re-allege and adopt paragraphs 1 through 63 above as if fully set forth herein.

65.     Plaintiffs entered into contracts with Commonwealth by executing and delivering the Subscription Agreement.

66.     Defendants breached contracts with the respective Plaintiffs.

67.     Plaintiffs have been damaged by Defendants' breach of contract.

        WHEREFORE Plaintiffs demand a judgment against Defendants for rescission damages, interest, costs and such other and further relief this Court deems just and proper.

## COUNT II - VIOLATION OF §10(b)5
## OF THE SECURITIES EXCHANGE ACT OF 1934

68.     Plaintiffs re-allege and adopt paragraphs 1 through 67 above, as if fully set forth herein.

69.     As a result of the activities described in Paragraphs 1 through 60 above, Defendants in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of

business which operated as fraud or deceit upon purchasers and sellers of securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.     Defendants knew, or were reckless in not knowing, of the conduct described in the allegations.

71.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

72.     Defendants' actions or omissions resulted in fraud or deceit in the connection with the purchase or sale of a security.

WHEREFORE, Plaintiffs demand a judgment against Defendants for damages, punitive damages, interest, costs and such other further relief this Court deems just and proper.

## COUNT III – VIOLATION OF §12(2) OF
## THE SECURITIES EXCHANGE ACT OF 1934

73.     Plaintiffs re-allege and adopt paragraphs 1 through 72 above, as if fully set forth herein.

74.     As a result of activities described in paragraphs 1 through 72 above, Defendants, in connection with the purchase or sale of securities, by use of the means or instruments of interstate commerce or the mails, by means of a prospectus or oral communication, made untrue statements of a material fact or omissions to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made not misleading.

75.     Defendants' actions or omissions resulted in fraud or deceit in the connection with the purchase or sale of a security.

WHEREFORE, Plaintiffs demand a judgment against Defendants for rescission damages, punitive damages, interest, costs and such other further relief this Court deems just and proper.

## COUNT IV - NEGLIGENCE

76.     Plaintiffs re-allege and adopt paragraphs 1 through 75 above, as if fully set forth herein.

77.     At all times material hereto, Defendants owed the highest duty of care to Plaintiffs.

78.     Defendants breached their duty of care to Plaintiffs.

79.     Defendants' negligence is the direct and proximate cause of damages to Plaintiffs.

WHEREFORE, Plaintiffs demand a judgment against Defendants for damages, interest, costs and such other and further relief this Court deems just and proper.

## COUNT V — FRAUDULENT CONCEALMENT

80.     Plaintiffs re-allege and adopt paragraphs 1 through 79 above as if fully set forth herein.

81.     Defendants had a duty to disclose to Plaintiffs, limited partner investors, an accurate, straight forward understanding of the value of their investments. Defendants possessed the requisite information which was of considerable importance to Plaintiffs but unknown to them. Defendants purposely and consciously failed to disclose and misrepresented the equity of each of Plaintiffs' investments in order to mask the extensive losses sustained by the Fund.

82.     Defendants' actions were of a manner that would toll any application statute of limitations.

WHEREFORE, Plaintiffs demand a judgment against Defendants for damages, punitive damages, interest, costs and such other and further relief this Court deems just and proper.

## COUNT VI – COMMON LAW FRAUD

83.     Plaintiffs re-allege and adopt paragraphs 1 through 82 above as if fully set forth herein.

84.     Defendants made false representations and material omissions directly or through their agents or employees.

85.     Defendants knew, or should have known at the time, that the representations were false.

86.     Defendants knew, or should have known, that Plaintiffs relied on the misrepresentations to their detriment.

87.     Defendants' actions were willful, wanton and reckless.

WHEREFORE, Plaintiffs demand a judgment against Defendants for damages, punitive damages, interest, costs and such other and further relief this Court deems just and proper.

## CONCLUSION

WHEREFORE, Plaintiffs demand a monetary award of damages against Defendants in excess of $1,800,000 dollars plus interest, costs and such other and further relief which the Court deems just and proper.


Dated: September 26, 2016

BY: _____

TODD A. ZUCKERBROD ESQ.
Florida Bar #573337
TODD A. ZUCKERBROD, P.A.
40 SE 5th Street, Suite 400
Boca Raton, Florida 33432
Telephone:  (561) 544-8144
Facsimile:  (561) 544-1101
E-Mail: tz@tzbrokerlaw.com