UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHRISTINE ALBERS; RICHARD
BARROW; MARYLOU BARROW;
ASHLEY CHILDS; THOMAS DOWNS;
JOE FASOLO; ROSEMARY FASOLO;
ROBIN LEAGER; DONALD MARKS;
FRANCES MURN; THOMAS NORRIS;
DEAN O'DONNELL; FELICIA
O'DONNELL; BRENDA GULRICH;
MATHEW GULRICH; STANLEY
SETTLE; LISA SETTLE; SUSAN
CECALA; TREVOR MAYHEW; MARIA
COHEN; MICHAEL SZPARAGA;
MARVIN SANDLER; DIANE
SANDLER; HELEN McAULIFFE;
NICOLE BARON; and ALAINE
PATTON,

                    Plaintiffs,

v.                                            Case No. 6:16-cv-1713-Orl-37DCI

COMMONWEALTH CAPITAL CORP.;
COMMONWEALTH INCOME AND
GROWTH FUND, INC.;
COMMONWEALTH CAPITAL
SECURITIES CORP.; and KIMBERLY
SPRINGSTEEN-ABBOTT,

                    Defendants.
_____

## ORDER

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs'

Amended Complaint and Incorporated Memorandum of Law (Doc. 25), Plaintiffs'

Memorandum in Opposition to Motion to Dismiss (Doc. 33), and Defendants' Reply to

Plaintiffs' Memorandum in Opposition to Motion to Dismiss (Doc. 37).

**BACKGROUND**

On **September 28, 2016**, twenty-six Plaintiffs from five states—including Florida—initiated this state law and federal securities law action against: (1) Florida equipment leasing funds manager, Commonwealth Income and Growth Fund, Inc. ("**CW Income Fund**"); (2) Florida broker-dealer, Commonwealth Capital Securities Corp. ("**CW Securities**"); (3) Florida equipment leasing and financial services company, Commonwealth Capital Corp. ("**CW Parent**"), which is the owner of CW Securities and is the parent company of CW Income Fund; and (4) Florida resident Kimberly Springsteen Abbott ("**KSA**"), who is the Chief Executive Officer ("**CEO**") or controller of CW Parent, CW Income Fund, and CW Securities ("**Corporate Defendants**").[1] (*See* Doc. 1; *see also* Doc. 15, ¶¶ 25–28.)

Dissatisfied with the management and performance of investments in certain equipment leasing funds ("**Funds**"),[2] in this action, Plaintiffs seek "a monetary award of damages against Defendants in excess of $1,800,000."[3] (*See id.* ¶ 26.) In their seven-count

---

[1] In February 2005, KSA's former spouse—George S. Springsteen—was the CEO and President of CW Income Fund and CW Parent, and KSA was the President of CW Securities and the "Executive Vice President, Director, Chief Operating Officer and Secretary" of CW Income Fund and CW Parent. (Doc. 1-2, pp. 4–5.)

[2] The Funds are Commonwealth Income and Growth Fund 1 ("**CIGF1**"), Commonwealth Income and Growth Fund 2 ("**CIGF2**"), Commonwealth Income and Growth Fund 3 ("**CIGF3**"), Commonwealth Income and Growth Fund 4 ("**CIGF4**"), and Commonwealth Income and Growth Fund 5 ("**CIGF5**"). (*See* Doc. 15, ¶ 32.)

[3] In their Amended Complaint, Plaintiffs confusingly refer to the four Defendants collectively as "Commonwealth." (Doc. 15, p. 2.)

Amended Complaint,[4] Plaintiffs assert three federal securities claims:

(a)      an implied right of action for violations of § 10(b) of the Securities Exchange Act of 1934 ("**1934 Act**"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (*id.* ¶¶ 33–73 ("**Securities Fraud Claims**"));

(b)      an express right of action for violations of § 12(a)(2) of the Securities Act of 1933 ("**1933 Act**"), 15 U.S.C. § 77*l*(2) (Doc. 15, ¶¶ 1–78 ("**Prospectus Claims**")); and

(c)      an implied right of action for violations of § 14(e) of the 1934 Act, 15 U.S.C. § 78n(a)(9), and Rule 14a-9, 17 C.F.R. § 240.14a-9 (*id.* ¶¶ 41, 42, 53–58, 100–08 ("**Proxy Claims**")).

Plaintiffs bring their remaining claims under unspecified state law for breach of contract (*id.* ¶¶ 32–69 ("**Contract Claim**")), negligence (*id.* ¶¶ 32–63, 79–82 ("**Negligence Claim**")), fraudulent concealment (*id.* ¶¶ 41–42, 53–58, 83–90 ("**Concealment Claim**"), and fraud (*id.* ¶¶ 41–42, 53–58, 91–99 ("**Fraud Claim**")).

Plaintiffs allege that the Court "has subject matter jurisdiction pursuant to § 27 of the 1934 Act,"[5] which provides exclusive jurisdiction over the Securities Fraud and Proxy Claims. (Doc. 15, ¶ 29.) Although not explicitly alleged, this Court also may exercise subject matter jurisdiction over the Prospectus Claims under § 22 of the 1933 Act, 15 U.S.C. § 77v(a). Further, the Court has discretion to exercise supplemental jurisdiction

---

[4] The Court dismissed Plaintiffs' initial Complaint as a shotgun pleading (Doc. 11), and Plaintiff filed an Amended Complaint on October 28, 2016 (Doc. 15).

[5] Section 27 provides that the "district courts of the United States . . . shall have exclusive jurisdiction of violations of this [Chapter 2B, Securities Exchange Act of 1934 ("**1934 Act**")] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." 15 U.S.C. § 78aa.

over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

Defendants jointly moved to dismiss Plaintiffs' Amended Complaint on the grounds that: (1) Plaintiffs failed to allege economic loss and loss causation for their Proxy Fraud Claims; (2) the Securities Fraud Claims and the Prospectus Claims are time-barred; (3) the Securities Fraud Claims do not comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("**Rule 9(b)**") and the Private Securities Litigation Reform Act ("**PSLRA**");[6] and (4) after dismissal of the federal securities claims, the Court should decline to retain jurisdiction over the state-law claims. (*See* Doc. 25 ("**MTD**").) Plaintiffs responded (Doc. 33 ("**Response**")), and Defendants replied (Doc. 37 ("**Reply**")).

In accordance with the PSLRA, 15 U.S.C. § 78u-4(b)(3)(B), the Court stayed these proceedings pending resolution of the MTD. (Doc. 28.) On June 21, 2017, the Court held a hearing concerning the MTD. (Doc. 41.) Upon consideration, and for the reasons set forth below, the Court finds that:

> (1) the Prospectus and Securities Fraud Claims are due to be dismissed with prejudice as time-barred under the applicable statutes of repose ("**SOR**");
>
> (2) the Proxy Claims are due to be dismissed without prejudice for failure to allege economic loss and loss causation;
>
> (3) the state claims are due to be dismissed without prejudice for want of subject matter jurisdiction; and

---

[6] In 1995, Congress enacted the PSLRA to impose "procedural and substantive limitations" upon private rights of action available under § 10(b) and Rule 10b-5. *See Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1063 (2014) (citing 15 U.S.C. §§ 77z-1, 78u-4, 78u-5).

(4)     Should they desire, Plaintiffs should be afforded one more chance to replead their Proxy Claims.

## FEDERAL SECURITIES LAW

"The 1933 and 1934 Acts constitute interrelated components of the federal regulatory scheme governing transactions in securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 727–28 (1975). Both laws serve to substitute "a philosophy of full disclosure for the philosophy of caveat emptor and thus . . . achieve a high standard of business ethics in the securities industry." *See Kokesh v. S.E.C.*, __ U.S. __, __ S.Ct __, 2017 WL 2407471, at *3, n.1 (2017) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)). These laws are applied to compensate defrauded investors, and "prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation." *See Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986).

Congress provided enforcement mechanisms and explicit private causes of action under the Acts. *See Blue Chip*, 421 U.S. at 728 ("The various sections of the 1933 Act dealt at some length with the required contents of registration statements and prospectuses, and expressly provided for private civil causes of action.") The courts also have implied limited rights of action under certain provisions of the Acts. *See id*. at 730. Pending legislative action, the courts must carefully delimit such implied private rights of action. *See id*. at 749.

## I.      § 10(b) of the 1934 Act

Courts have implied a limited private right of action "to sue for damages suffered through" violations of § 10(b) of the 1934 Act and Rule 10b-5.[7] *See Chadbourne*, 134 S. Ct. at 1063. Under § 10(b), it is unlawful for any person, directly or indirectly, to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange Commission ("**SEC**")] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)      To employ any device, scheme, or artifice to defraud,
>
> (b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (emphasis added).

---

7 "[A]ctions that violate Rule 10b–5 automatically violate § 10(b) as well." *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 856, n.6 (11th Cir. 2016) (citing *Stoneridge Inv. Partners, LLC v. Sci.–Atlanta*, 552 U.S. 148, 157 (2008)).

Section 10(b) claims are, "in essence," claims of "fraud made in connection with the purchase or sale of securities." *See 100079 Can., Inc. v. Stiefel Labs., Inc.*, 596 F. App'x 744, 747 n.4 (11th Cir. 2014); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) (reiterating that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act"). Six elements must be established: (1) the defendant must either engage in a fraudulent scheme or make a material misrepresentation or omit a material fact; (2) the defendant must act with scienter; (3) "a connection" must exist between the purchase or sale of a security and the misrepresentation, omission, or fraudulent scheme; (4) the plaintiff must rely upon the misrepresentation or omission; (5) plaintiff must suffer an economic loss; and (6) loss causation must exist.[8] *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011).

The first element incorporates several requirements—a misrepresentation or omission (or fraudulent scheme),[9] that is material, and that is made by the defendant.

---

[8] "The loss causation element requires that a defendant's fraud be both the but-for and proximate cause of a plaintiff's later losses." *Kinnett v. Strayer Educ., Inc.*, 501 F. App'x 890, 892 (11th Cir. 2012). Plaintiffs "need not show that the defendant's misconduct was the 'sole and exclusive cause' of [their] injury; [plaintiffs] need only show that the defendant's act was a 'substantial' or 'significant contributing cause.'" *Id.* (quoting *FindWhat*, 658 F.3d at 1309). At the pleading stage, plaintiff must allege "something beyond the mere possibility of loss causation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[9] "A scheme liability claim is different and separate from a nondisclosure claim." *IBEW*, 660 F. App'x at 858 (finding that plaintiffs had inadequately alleged that the defendant's "stock repurchase plan, apart from the misstatements and omissions about [defendants'] motivation for the plan, was deceptive conduct"). "Misleading statements and omissions only create scheme liability in conjunction with 'conduct beyond those misrepresentations or omissions.'" *Id.* (quoting *WPP Lux. Gamma Three Sarl v. Spot*

A statement is a "misrepresentation . . . if 'in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it.'" *IBEW*, 660 F. App'x at 857 (quoting *FindWhat*, 658 F.3d at 1305). An actionable omission requires that a duty to disclose exist in light of "'the extent of the defendant's knowledge and the significance of the misstatement, fraud or omission,' as well as '[t]he extent of the defendant's participation in the fraud.'" *Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 716 (11th Cir. 2014) (quoting *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986)). To be material, a statement or omission must concern "specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell" a security. *See id.* Finally, statements and omissions are "made" by "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."[10]

The second element—scienter—is "a mental state embracing intent to deceive, manipulate, or defraud." *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010). Scienter is established when the facts give rise to "a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the alleged materially false or incomplete statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230,

_____

*Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011)).

[10] *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (noting that, absent control, "a person or entity can merely suggest what to say, not 'make' a statement in its own right" and dismissing claims against investment advisors); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1197, 1205 (11th Cir. 2001) (noting that primary liability under § 10(b) and Rule 10b–5 requires that the alleged misstatement or omission "upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's investment decision was made").

1238 (11th Cir. 2008). A defendant is severely reckless when she makes "highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *FindWhat.com*, 658 F.3d at 1300.

## II.  § 12(a)(2) of the 1933 Act

Like § 10(b), § 12 prohibits misstatements or omissions of material fact in relation to the sale of a security:

> Any person who — . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l*(a)(2).[11] Unlike § 10(b), scienter and reliance are not elements of a § 12(a)(2) claim. *See Hochfelder*, 425 U.S. at 208–10.[12] Rather, a § 12(a)(2) claim has only four

---

[11] *See Cent. Bank of Denver, N.A.*, 511 U.S. at 179 (noting that § 12 liability is limited to those "who offer or sell the security"); *Loftsgaarden*, 478 U.S. at 655 (noting that "rescission" is the remedy prescribed by § 12 "except where the plaintiff no longer owns the security").

[12] *See also Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (noting that "neither allegations of fraud nor scienter are necessarily part" of a § 12(a)(2) claim); *Currie v. Cayman Res. Corp.*, 835 F.2d 780, 782–83 (11th Cir. 1988) (same).

elements: (1) the prospectus contained an omission or untrue statement; (2) that was material;[13] (3) the defendants transferred title to the security or successfully solicited the purchase; and (4) the plaintiffs "purchased or sold" the security "in connection with the defendants' actions." *See Licht v. Watson*, 567 F. App'x 689, 692 (11th Cir. 2014) (dismissing § 12(a)(2) claim where plaintiff failed to allege that he purchased a security); *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1266 (11th Cir. 2013) (affirming dismissal of complaint).

## III. § 14(a) of the 1934 Act and Rule 14a-9

While § 12(a)(2) concerns untruthful offering materials, § 14(a) and Rule 14a-9 concerns untruthful proxy solicitations:

> No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

17 C.F.R. § 240.14a–9; *see also* 15 U.S.C.A. § 78n(a)(1). The courts have recognized an "implied right of action for the breach of § 14(a) as implemented by SEC Rule 14a-9."

---

[13] Generally, an omission is considered "material" when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). Under the PSLRA's "safe harbor provision, forward-looking statements 'accompanied by meaningful cautionary statements' explaining the risks that may preclude a forward-looking projection from coming to fruition are immaterial as a matter of law." *Miyahira*, 715 F.3d at 1266 (quoting 15 U.S.C. § 78u–5(c)(1)(A)). The trier of fact usually determines whether the objective materiality test is met, and the issue should not be resolved by the court as a matter of law unless "the lack of importance of the omission is so plain that reasonable minds cannot differ thereabout." *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002).

*Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1086–87 (1991).

**PLEADING STANDARDS**

In resolving the MTD, three different pleading standards are at issue: (1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2) ("**Rule 8**"); (2) the special fraud pleading requirements in Rule 9(b); and (3) the PSLRA's heightened pleading requirements.[14] *See In re Galectin Therapeutics, Inc. Secs. Litig.*, 843 F.3d 1257, 1269 (11th Cir. 2016); *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010) ("Because Rule 10b-5 sounds in fraud, the plaintiff must plead the elements of its violation with particularity."); *Wagner*, 464 F.3d at 1278 (noting that a § 12(a)(2) claim must be plead with particularity when the § 12(a)(2) violation "is part and parcel of a larger fraud").

Rule 8(a)(2) simply requires that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Mizzaro*, 544 F.3d at 1237. Although detailed factual allegations are not required, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.*

---

[14] In their Response, Plaintiffs do not acknowledge that the Amended Complaint must meet any heightened pleading requirement; rather, they incorrectly state that a pleading "cannot be dismissed unless 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" (*See* Doc. 33, p. 5 (quoting a case decided six years before *Iqbal* and *Twombly*—*Roe II v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 682 (11th Cir. 2001).)

To satisfy Rule 9(b), a complaint must "state with particularity the circumstances constituting fraud." *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 860 (11th Cir. 2015), *cert. denied sub nom*, *Norfolk Cty. Ret. Sys. v. Health Mgmt. Assocs., LLC*, 137 S. Ct. 1331 (2017). "The particularity requirement of Rule 9(b) is satisfied if the complaint alleges facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012); *Mizzaro*, 544 F.3d at 1237 ("[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements.").

In an effort to check "abusive litigation by private parties," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), the PSLRA wrought two primary changes to securities pleading requirements:

> First, the PSLRA slightly altered Rule 9(b)'s particularity requirement by mandating that a securities fraud . . . complaint
>
> > specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> 15 U.S.C. § 78u–4(b)(1)(B).
>
> Second, and more importantly, the PSLRA raised the standard for pleading scienter. Specifically, in any securities fraud . . . action

> in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
>
> 15 U.S.C. § 78u–4(b)(2). . . . Moreover, the complaint must allege facts supporting a strong inference of scienter "for each defendant with respect to each violation."

*Mizzaro*, 544 F.3d at 1237–38 (quoting *Phillips*, 374 F.3d at 1016). A "strong inference" of scienter is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010) (explaining that plaintiffs must plead "with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements").

## THE AMENDED COMPLAINT

In the context of a securities action, the twenty-six page Amended Complaint is not lengthy, but it does reference fourteen voluminous exhibits, which were filed with the Initial Complaint—not the Amended Complaint.[15] (*See* Docs. 1-1 to 1-32.) The Table below identifies each of the exhibits with correct docket citations.

---

[15] The parties do not object to the Court's consideration of the previously filed exhibits. (*See* Doc. 39, p. 2 ("Defendants do not object to the Court's consideration of the exhibits attached to Plaintiff's [I]nitial Complaint); *see also* Doc. 38 (advising that the "Court will consider the exhibits filed with Plaintiff's initial Complaint").)

| Exhibit | Docket |
|---|---|
| CIGF5 Prospectus, dated February 2005 | Docs. 1-1 to 1-5 |
| CIGF5 Subscription Agreement | Doc. 1-5, pp. 16–19 & Doc. 1-14 |
| CIGF5 Limited Partnership Agreement, dated February 4, 2005 | Doc. 1-5, pp. 22–24 to Doc. 1-8, pp. 1–6 |
| CIGF5 Financial Statements for 2003, 2004, and 2005 | Doc. 1-8, pp. 8–30 to Doc. 1-9, pp. 1–19 |
| CIGF5 Prospectus Supplement | Doc. 1-9, pp. 22–34 to Doc. 1-11 |
| CIG5 Offering Summary | Docs. 1-13 & 1-15 |
| CIGF5 Updates, dated June 30, 2013 and March 31, 2015 | Doc. 1-16 & Doc. 1-21 |
| Correspondence dated July 18, 2013, August 20, 2013, and April 11 & 29, 2014 | Docs. 1-18, 1-22 to 24 |
| CIGF5 Annual Report for 2012 and 2013 | Docs. 1-19 & 1-20 |
| IRA statements from 2012, 2013, 2015, and 2016 | Doc. 1-25 |
| FINRA Decision | Docs. 1-26 to 1-32 |
| CIGF5 Proxy Solicitation, dated September 7, 2015 | Doc. 1-17 |

In resolving the MTD and setting forth the facts below, the Court has considered the above documents in their entirety. *See Meyer v. Greene*, 710 F.3d 1189, 1193, n.5 (11th Cir. 2013) (quoting *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)). The Court also has considered the completed subscription agreements filed by Defendants (Doc. 39-1) because Plaintiffs have not questioned their authenticity, and they also are

"central to the [Plaintiffs'] case." *See SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (rejecting defendant's argument that district court erred in considering entirety of "account opening documents" referenced in securities fraud complaint).

## I.  The Investment

CIGF5 was formed on May 19, 2003, as a "Pennsylvania limited partnership" to own and lease "computer peripheral equipment" for the benefit of its investors.[16] (*See* Doc. 1-1, pp. 4, 8, 16; Doc. 1-6, pp. 4, 11; Doc. 1-8, p. 11; *see also* Doc. 1-13, p. 2 (advising that CIGF5 was "formed to acquire high technology leases from a wide range of Fortune 1000 and creditworthy companies across the country. . . . The income from these leases [is] anticipated to provide investors with distributions.").)

CW Income Fund was the general partner of CIGF5 and was responsible for managing CIGF5 and selecting CIGF5's "computer peripheral equipment investments." (Doc. 1-2, pp. 4, 7 (advising that CW Income Fund "is accountable to CIGF5 as a fiduciary and, consequently, must exercise good faith and integrity in handling partnership affairs"); Doc. 1-6, p. 7 (defining CW Income Fund as the "General Partner" of CIGF5); Doc. 1-7, p. 6.) KSA was CIGF5's initial limited partner, and—"acting through" CW Income Fund, KSA made "investment decisions" for CIGF5. (*See* Doc. 1-1, pp. 8–9 (advising that KSA and "George S. Springsteen, acting through [CW Income Fund], make our investment decisions").) The CIGF5 investors became limited partners under the

---

[16] CIGF5 "commenced operations on March 14, 2005." (Doc. 1-19, p. 11.)

terms of a Restated Limited Partnership Agreement ("**Partnership Agreement**"). (*See* Doc. 1-5, pp. 4, 9–10; Doc. 1-6, pp. 8, 12.)

In an effort to raise $25,000,000.00, between **February 2005** and **February 2006**, CW Parent and CW Securities offered units of CIGF5 ("**Units**") "for sale to the public through various brokerage firms" for $20 per Unit ("**CIGF5 Offering**").[17] (*See* Doc. 15, ¶¶ 33, 34.)[18] CW Securities and CW Parent produced sales materials for the CIGF5 Offering, which were considered part of the CIGF5 Prospectus Dated February 7, 2005 ("**Prospectus**").[19] (*See* Doc. 1-5, p. 11; Doc. 1-6, p. 9.) Through one of three brokers—Matt Albers, Mike Nixon, and Jeffrey Sanders—the Plaintiffs purchased Units by completing subscription agreements ("**Subscription**"), which were provided with the Prospectus. (*See* Doc. 15, ¶ 36; *see also* Docs. 1-1 to 1-5, 1-8 to 1-9; Doc. 39-1.)

---

[17] CW Income Fund and CW Securities received "substantial fees and compensation from the offering" of Units and CIGF5's operations. (*See* Doc. 1-1, pp. 11, 14 (advising that CW Income Fund and CW Securities "will receive substantial fees" from CIGF5); *see also* Doc. 1-2, p. 15; Doc. 1-3, pp. 1–2; Doc. 1-5, pp. 8–9; Doc. 1-6, pp. 14–16; Doc. 1-8, p. 16.)

[18] (*See also* Doc. 1-2, p. 1 (identifying CW Parent as "our Sponsor"); Doc. 1-5, p. 8 ("The [U]nits are offered through [CW Securities] as dealer manager."); Doc. 1-6, p. 10 (defining "Sponsor"); Doc. 1-15, p. 4 (stating that CW Parent and CW Securities was "pleased to offer" CIGF5 "through an extensive network of financial consultants"); *id.* at 21 (representing that the CIGF5 "Fund Summary" was "prepared for and authorized by" CW Securities and CIGF5).)

[19] The 71-page Prospectus provides information on varied topics, including: investor suitability standards, risk factors, the business plan, tax considerations, and conflicts of interest. (*See* Doc. 1-1 through 1-11.) Attachments to the Prospectus include: copies of the Subscription Agreement and the Partnership Agreement, selected financial data, tables reflecting the prior performance of other Funds offered by CW Parent and CW Income Fund, and supplements dated March 24, 2005 and November 20, 2005. (*See id.*)

The CIGF5 Offering was to be the first stage of a three-stage investment "life cycle" that was to last approximately ten years. (*See* Doc. 1-15, p. 16; *see also* Doc. 1-5, pp. 7–8 (advising that the "term of CIGF5 will expire on February 4, 2017"); Doc. 15, ¶ 37.) The funds raised in the CIGF5 Offering were to be used to purchase assets for CIGF5, and funds not so used were to be returned to investors ("**Reserve Refund**"):

> If all of the net proceeds of [the CIGF5 Offering] are not invested by CIGF5 in equipment or committed to such investment or otherwise utilized for proper partnership purposes prior to the expiration of 12 months from the completion of [the Offering], the net proceeds not so invested, committed, or set aside as working capital, reserves will thereupon be promptly returned to the limited partners with a proportionate share of interest at the rate earned by CIGF5 on the investment of such proceeds, based upon their respective number of units and time of purchase.

(*See* Doc. 15, ¶ 49; *see also* Doc. 1-2, p. 23.)

The second stage of CIGF5 was to be "the 'reinvestment or operating period' where leases are bought and sold and the portfolio is actively managed. This phase is structured to last approximately 8 years." (*See* Doc. 15, ¶ 37.) During the second stage, distributions were "expected to be made quarterly." (*See* Doc. 1-1, p. 11.)[20] Further, "[b]eginning 30 months after the completion" of the CIGF5 Offering, CW Income Fund had discretion to "redeem a limited number of units upon request" ("**Redemption**"). (*See*

---

[20] (*But see* Doc. 1-1, p. 16 ("Our operations may not ultimately be successful and we may be unable to meet our stated investment objectives. Specifically, sufficient cash may ultimately not be available for distribution to investors."); Doc. 1-3, p. 10 ("CIGF5 will make distributions of CIGF5's cash available for distribution that [CIGF5], in its sole discretion, determines is available for distributions."); Doc. 1-7, pp. 1–2 (advising that CW Income Fund shall, "determine in its sole and absolute discretion, the amount of Cash Available for Distribution").)

*id.* at 9, 12; Doc. 1-2, p. 13; Doc. 1-6, p. 12; Doc. 1-7, pp. 3, 13.)[21]

Finally, the third stage—the "liquidation phase"—was to commence in "the ninth year after the completion" of the CIGF5 Offering. (*See* Doc. 1-1, p. 12; Doc. 1-2 ("CIGF5 will begin to dispose of its equipment approximately nine years after the completion" of the CIGF5 Offering.).) "During liquidation, which is structured to last approximately 1-2 years, equipment is sold in an orderly fashion as leases expire. As the equipment is sold, proceeds are distributed proportionately to investors." (Doc. 15, ¶ 37.) According to the Partnership Agreement, CIGF5 was to exist for a term ending **February 4, 2017**, "at which time it shall be dissolved, unless previously dissolved in accordance with this [Partnership] Agreement." (*See* Doc. 1-6, p. 11; *see also* Doc. 1-7, pp. 15–16.)[22]

During the three stages of the CIGF5 investment, CIGF5's stated "principal investment objectives" were to:

- provide cash distributions to limited partners through the acquisition, lease and sale of computer peripheral equipment;

- preserve and protect limited partners' capital;

- use a portion of cash flow and sale proceeds, refinancing or other sale of equipment to purchase additional equipment; and

- refinance, sell or otherwise dispose of equipment in a manner that will maximize the proceeds to CIGF5 and subsequent

---

[21] (*But see*, Doc. 1-3, pp. 8–9 (advising that CW Income Fund "has complete discretion in deciding whether to establish an amount of redemption, based upon the amount of operating revenue available to fund redemptions. Therefore, there can be no assurance that any units for which redemption is requested will ever be redeemed").)

[22] (*See also* Doc. 1-7, p. 5 (providing that CIGF5 Income Fund has the authority to "commence the dissolution and liquidation of [CIGF5] in its eleventh year of existence in order to terminate [CIGF5] by February 4, 2017").)

overall return to investors.

(Doc. 1-2, p. 8; *see* Doc. 1-15, p. 2; *see also* Doc. 1-3, p. 6 (identifying the "overall goal" of returning "all of an investor's capital, plus a 10% return").) The Prospectus advised that CIGF5 would achieve these goals by leasing to "investment grade domestic lessees,"[23] and employing a diversification strategy "to minimize the effects of changes in specific industries, local economic conditions or similar risks."[24] (*See* Doc. 1-9, p. 25 ("Our investment strategy of acquiring computer equipment and generally leasing it under 'triple-net leases' to operators who generally meet specified financial standards minimizes our operating expenses.").)

Contrary to Plaintiffs' expectations: (1) no Net Refund issued to investors even though millions of dollars raised in the CIGF5 Offering were unused in **2007** (*see* Doc. 15, ¶¶ 49–52; *see also* Doc. 1-22, p. 2); (2) Plaintiffs were denied Redemption (*see* Doc. 15, ¶¶ 35, 68; *see also* Doc. 1-18, p. 2); (3) CIGF5 discontinued dividend payments to investors in **February 2011** (*see* Doc. 15, ¶ 44);[25] (4) the cessation of dividend payments in **2011** demonstrated that CIGF5's leases and lessees were not diverse (*see id.* ¶¶ 44, 45); (5) by

_____

[23] (*But see* Doc. 1-2, p. 11 (advising that CW Income Fund "has not established standards for lessees to which it will lease equipment and there is no investment restriction prohibiting CIGF5 from doing business with any lessees"); Doc. 1-9, p. 25 ("We review a customer's credit history before extending credit and establish a provision for uncollectible accounts receivable based upon the credit risk of specific customers, historical trends, and other information").)

[24] (*See* Doc. 15, ¶ 43 (explaining that "during the operational stage of CIGF5, we may not at any one point in time lease more than 25% of the equipment to a single person or affiliated group of persons"); *see also* Doc. 1-2, p. 10.)

[25] (*See also* Doc. 1-19, p. 12 (noting that CW Income Fund continues to suspend distributions, as part of an aggressive work out plan of reinvestment and recovery for lost equity experienced during the litigation process with Mobile Pro/City of Tempe").)

**2014**, a large percentage of CIGF5's leases were "below investment grade" (*see id.* ¶ 45); (6) in **2015**, CW Income Fund and KSA requested an extension of the second and third stages through a misleading proxy solicitation (*see id.* ¶ 41; *see also* Doc. 1-17); (7) in **2016** and **2017**, CIGF5 failed to liquidate assets and make distributions to investors (*see* Doc. 15, ¶¶ 35, 38); and (8) CIGF5 lost value (*see id.* ¶¶ 54–58; *see also* Doc. 1-17, p. 4 ("In its current condition, if [CIGF5] is liquidated as of the current closing date . . . the return of capital to limited partners could be minimal, due to cumulative equity loss . . . .").)

Plaintiffs posit that "the failure of CIGF5 to begin to repay investors is indicative of the negligent or incompetent management of CIGF5's assets." (Doc. 15, ¶ 40.) Plaintiffs further note that the Securities Exchange Commission ("**SEC**") and the Financial Industry Regulatory Authority ("**FINRA**") both found wrongdoing by the management of CIGF5. First, in **September 2013**, the SEC "announced a cease and desist proceeding" that concerned material misstatements in offering documents and securities filings for CIGF5 and eight other "equipment leasing funds" ("**2013 Proceeding**").[26] (*See id.* ¶ 59.) As a result of the 2013 Proceeding, CW Parent and KSA "were ordered to disgorge $1,548,688, pay prejudgment interest of $77,566, and pay a civil penalty of $150,000." (*See id.* ¶ 60.) Next, on **March 30, 2015**, FINRA's Office of Hearing Officers sanctioned KSA for "improperly allocating" to CIGF5 and other Funds "two types of expenses that were not related to the Funds' business: personal expenses and Broker-Dealer expenses." (*See id.*

_____

[26] The misstatements at issue in the 2013 Proceeding concerned the identity of "Controlling Persons" and who would pay the expenses of ten to fifteen key personnel. (*See* Doc. 15, ¶ 59; *see also* Doc. 1-20, p. 4.) Plaintiffs do not base their claims in this action on those misstatements.

¶¶ 61, 62; Docs. 1-26 to 1-29 ("**FINRA Decision**"); *see also* Doc. 1-20, p. 4 (advising that FINRA initiated its complaint on **May 3, 2013**).) Plaintiffs complain that KSA remains "as CEO of the Commonwealth group of companies pending the outcome of her appeal" of the FINRA Decision. (*See* Doc. 15, ¶ 63.)

## DISCUSSION

At the outset, the Court finds that Plaintiffs' claims concerning CIGF1, CIGF2, CIGF3, and CIGF4 are due to be dismissed because Plaintiffs' only support for such claims is that they are "illustrated" through CIGF5 allegations and "the records will show that the same or similar allegations will be proven with respect to [CIGF1 through CIGF4]." (*See* Doc. 15, ¶ 32; *id.* ¶¶ 71, 74 (alleging "on information and belief" that the offering materials for CIGF1 through CIGF4 "were false and misleading in material respects"); *see also* Doc. 33, p. 3 (explaining that "the particular claims are explained in the context of [CIGF5] but apply equally to" CIGF1 through CIGF4).) Such summary allegations are patently deficient.

In addition, it appears that several persons are named as Plaintiffs in this action who did not invest in any of the Funds. (*See* Doc. 25, p. 6, n.2 (asserting that none of the named Plaintiffs invested in CIGF1, CIGF2, and CIGF3, and nine of the named Plaintiffs did not invest in any of the Funds at all—rather, they invested in distinct *private* funds offered by Defendants).) Defendants filed investment documentation indicating that the Plaintiffs identified in the table below invested in CIGF4 or a *private* fund—but *not* CIGF5.

(*See* Doc. 39-1.)[27] Plaintiffs did not dispute Defendants' assertions or challenge their documents. (*See* Doc. 33, p. 3.) Because repleader will be permitted, Plaintiffs are cautioned to carefully review whether they have a good faith basis to assert claims in this action on behalf of the following Plaintiffs:

| **Plaintiff** | **Domicile** | **Investment** | **Fund** | **Broker** | **Date** |
|---|---|---|---|---|---|
| Ashley Childs (Doc. 39-1, pp. 13–16) | Georgia | $200,000 | P3 | Albers | 11/22/06 |
| Joseph Fasolo (Doc. 39-1, pp. 21–24) | Maryland | $90,000 | P3 | Albers | 1/31/07 |
| Rosemary Fasolo (Doc. 39-1, pp. 21–24) | Maryland | $30,000 | P3 | Albers | 1/3/07 |
| Donald Marks (Doc. 39-1, pp. 34–37) | Maryland | $40,000 | P3 | Albers | 12/11/06 |
| Travers Mayhew (Doc. 39-1, pp. 64–67) | Virginia | $100,000 | P1 | Nixon | 12/16/04 |
| Maria Cohen (Edward) (Doc. 39-1, pp. 69–70) | Florida | $150,000 | P2 | Sanders | 11/2/05 |
| Helen McAuliffe (Doc. 39-1, pp. 82–85) | Florida | $56,320 $100,000 | CIGF4 P1 | Winslow Sanders | 9/8/03 1/20/04 |
| Nicole Baron (Doc. 39-1, pp. 87–88) | Florida | $100,000 | P2 | Scheiner | 3/15/06 |
| Alaine & Roger Patton (Doc. 39-1, pp. 90–93) | Michigan | $100,000 | P4 | Lamont | 3/20/09 |

[27] To protect Plaintiffs' highly confidential identifying information, the Court struck the evidence initially submitted by Defendants concerning actual investments made by the named Plaintiffs. (*See* Doc. 38; *see also* Doc. 25-1.) Defendants filed redacted copies of documents on March 23, 2017. (Doc. 39-1.)

# I.  Proxy Claims, § 14(a)

In their MTD, Defendants contend that the Court should dismiss the Proxy Claims because Plaintiffs have not alleged "whether they suffered an economic loss or how that loss would have been caused by the extension itself." (*See* Doc. 25, pp. 19–20.) To defeat the MTD, Plaintiffs must allege that they suffered damages caused "by the policies . . . approved via [the untruthful] proxy"—not by management's failure to follow those policies. *See Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 796–97 (11th Cir. 2010) (affirming dismissal of § 14(a) claim); *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 385 (1970) (noting that a §14(a) plaintiffs' alleged damages must be caused by the "proxy solicitation itself"). Plaintiffs have patently failed to allege such facts here—to the contrary, Plaintiffs allege on information and belief that CIGF5 is continuing to operate even though the limited partners did *not* approve the proxy. (*See* Doc. 15, ¶ 104.) Accordingly, the Proxy Claims fail.[28]

# II.  Statutes of Repose

Securities claims that are barred by an SOR should be dismissed at the pleading stage. *See also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991); *Hochfelder*, 425 U.S. at 210–11 (noting that the SOR for § 12 reflects a "carefully drawn procedural restriction[]" that should be enforced at the pleading stage); *Dusek v. JPMorgan Chase & Co.*, 132 F. Supp. 3d 1330, 1348 (M.D. Fla. 2015), *aff'd*, 832 F.3d 1243

---

[28] Even a cursory review of the Amended Complaint shows that Plaintiffs have not alleged that they suffered an injury resulting from the proxy solicitation as opposed to earlier mismanagement or wrongdoing. (*See* Doc. 15, ¶¶ 41, 42, 53–58, 100–08.)

(11th Cir. 2016). This is so because the "purpose of a statute of repose is to create an absolute bar on a defendant's temporal liability." *See Cal. Public Emps. Retirement Sys. v. ANZ Secs., Inc.*, __ U.S. __, __ S.Ct. __, 2017 WL 2722415, at *8 (2017).

The SOR for the Prospectus Claims is three years from the date of the sale of the security. *See* 15 U.S.C. § 77m (providing that no action may be brought "more than three years after the sale").[29] The SOR for the Securities Fraud Claims is five years, which runs from the date of the violation. *See* 28 U.S.C. § 1658(b); *see CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2182 (2014) (explaining that statutes of repose are measured "from the date of the last culpable act or omission of the defendant"); *100079 Can., Inc.*, 596 F. App'x at 747–48. Equitable tolling is inapplicable to these SORs. *See ANZ Secs., Inc.*, 2017 WL 2722415, at *9 (noting that statues of repose "override customary tolling rules arising from the equitable powers of courts); *Dusek*, 832 F.3d at 1247 (affirming dismissal of securities claims brought more than five years after closure of investment company).

Because Plaintiffs initiated this action on **September 28, 2016**: (1) their Prospectus Claims cannot be based on sales of securities that occurred before **September 28, 2013**; and (2) their Securities Fraud Claims cannot be based on violations that occurred before **September 28, 2011**. The Prospectus Claims are based on Plaintiffs' purchases of CIGF5 Units, which indisputably occurred in 2005 and 2006—approximately a decade before

---

[29] *See also Berman v. Blount Parrish & Co.*, 525 F.3d 1057, 1059 (11th Cir. 2008) (affirming dismissal of § 12(a) claim filed more than three years after purchase of security); *Armbrister v. Roland Int'l Corp.*, 667 F. Supp. 802, (M.D. Fla. 1987) (holding that § 12 claim brought more than three years after execution of a contract for sale was "absolutely barred").

Plaintiffs filed this action. (*See* Doc. 15, ¶¶ 32–33; *see also* Doc. 39-1.) Thus, the Prospectus Claims are due to be dismissed with prejudice as barred by the SOR.

Defendants argue that the Securities Fraud Claims also are time-barred because any violations of § 10(b) occurred, at the latest, on the date the CIGF5 Units were sold. (*See* Doc. 15, pp. 10–14.) Plaintiffs counter that their Securities Fraud Claims based on the CIGF5 Offering are not barred because of the "myriad of material misrepresentations and omissions which occurred past the [CIGF5 Offering] period, up to and including . . . December 2015." (*See* Doc. 33, pp 8–9 (arguing that "the protracted efforts by Defendants to deceive the Plaintiffs continued well within the applicable limitations periods").)

Plaintiffs argument fails because any alleged misrepresentations or omissions that occurred within the SOR period—for instance the 2013 Annual Report and e-mails in 2013 and 2014—are not "violations" of §10(b) because they were not made "in connection with [the] purchase or sale of any security." *See Chadbourne*, 134 S. Ct. at 1066. A fraudulent misrepresentation or omission is made "in connection with [the] purchase or sale of [any] security" when "it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell" such security.[30] *See Chadbourne*, 134 S. Ct. at 1066; *S.E.C. v.*

---

[30] In the context of a fraudulent scheme, the "connection" element is met when the sale or purchase of a security "coincides" with the defendant's fraudulent acts. *See S.E.C. v. Zandford*, 535 U.S.813, 820–21, 825 (2002) (holding that a broker's "fraudulent scheme in which he made sales of his customer's securities for his own benefit" met the "connection" element in a § 10(b) enforcement action because the "scheme to defraud and the sale of securities coincide[d]"); *see also Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 597 (2001) (finding that the "connection" element was met where the defendant sold a security option with the fraudulent intent and purpose to deprive the purchaser of the benefit of the sale); *United States v. O'Hagan*, 521 U.S. 642, 656 (1997) (noting that the connection element is met when breach of a duty not to use confidential

*Goble*, 682 F.3d 934, 946 (11th Cir. 2012) (finding that district court erred in finding that a misrepresentation was made "in connection with the purchase or sale of securities"). The 2013 and 2014 statements and omissions relied on by Plaintiffs could not be material to the Plaintiffs' only alleged decisions to buy or sell securities—which occurred in 2005 and 2006. Thus, the Securities Fraud Claims also are due to be dismissed with prejudice as barred by the SOR.[31]

## III.   Heightened Pleading Standards

Again, Plaintiffs must allege each Defendants' scienter with specificity, 15 U.S.C. § 78u–4(b)(2), and they must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1)(B). *See Mizzaro*, 544 F.3d at 1237. The Amended Complaint falls far short of these standards.

As noted above, Plaintiffs' claims concern sales of CIGF5 Units in 2005 and 2006. With respect to these transactions, Plaintiffs allege that:

> Defendants knew at the time of the offering and sale of the [CIGF5 Units] that: [CIGF5] would not be properly diversified

_____

information for trading purposes coincides with a securities transaction).

[31] *See Fischler*, 971 F. Supp. at 537 (dismissing securities claim brought more than five years after plaintiff's purchase of security); *Champion v. Homa*, No. 3:03-cv-275-MEF, 2008 WL 900967, at *10 (M.D. Ala. Mar. 31, 2008) (dismissing securities claim based on statute of repose); *Held v. Davis*, 778 F. Supp. 527, 528 (S.D. Fla. 1991) (dismissing securities claims where complaint was "devoid of any allegation that the defendants solicited an investment from [plaintiff], or that [plaintiff] made an additional investment" within the period of repose).

in accordance with the Offering Material, that investors' funds not allocated to leases within twelve months from the completion of the [CIGF5 Offering] would not be properly diversified in accordance with the Offering Material, that the risk levels associated with the particular leases would be of a lower grade as that specified in the Offering Material, that investors would not have an opportunity to redeem investments consistent with the terms of the Offering Material, that the duration of the leases would preclude the return of capital to investors in years 9 and 10 of the investment in accordance with the Offering Material . . . [And KSA] as the control persons of [the Corporate Defendants] omitted from disclosure in the Offering Material that she would misuse for her own use and benefit millions of dollars of investors' funds.

(Doc. 15, ¶ 19.) Notably, Plaintiffs rely entirely on events in 2011 and after to establish Defendants' purported knowledge in 2005 and 2006. Such temporally-removed facts simply do not raise plausible inferences that the alleged statements were in fact false or that the Defendants' possessed the requisite scienter. Accordingly, even if Plaintiffs' Securities Fraud and Prospectus Claims were not time-barred, dismissal would still be required because the Amended Complaint does not meet the heightened pleading requirements of Rule 9(b) and the PSLRA.

## IV.     Controlling Person Liability, § 20(a)

In their Response, Plaintiffs argue that the Corporate Defendants are "liable under Section 10(b), Rule 10b-5 and Section 12(a)(1)," as "controlling persons for primary violations by KSA." (Doc. 33, p. 12.) Section 20(a) of the 1934 Act imposes liability on "controlling persons" who aid and abet "any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). The elements of a § 20(a) claim are: "(1) a primary violation of federal securities laws," and; (2) the

defendant's exercise of "actual power or control over the primary violator'" and the specific corporate policy which resulted in the primary liability. *See Galectin*, 843 F.3d at 1276 (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)); *Kinnett*, 501 F. App'x at 894. The Amended Complaint does not reference section 20(a), nor does it allege a primary violation; accordingly, the Court rejects Plaintiffs' § 20(a) argument.[32]

## V. The State Law Claims

Because Plaintiffs have not adequately stated any federal claim and two of their federal claims must be dismissed with prejudice as time-barred, the Court will decline to exercise jurisdiction over Plaintiffs' Breach of Contract, Negligence, Fraud, and Concealment Claims at this juncture. *See Licht*, 567 F. App'x at 695, n.2 (affirming dismissal of state law claims after dismissal of securities claims).

### CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

(1)    Defendants' Motion to Dismiss Plaintiffs' Amended Complaint and Incorporated Memorandum of Law (Doc. 25) is **GRANTED** in accordance with this Order.

(2)    Plaintiffs' Securities Fraud Claims (Doc. 15, ¶¶ 33–73) are **DISMISSED WITH PREJUDICE**.

(3)    Plaintiffs' Prospectus Claims (Doc. 15, ¶¶ 1–78) are **DISMISSED WITH PREJUDICE**.

---

[32] The Court rejects all arguments raised by Plaintiffs that are not supported by the allegations of their Amended Complaint.

(4)     Plaintiffs' Proxy Claims (Doc. 15, ¶¶ 41, 42, 53–58, 100–08) are **DISMISSED WITHOUT PREJUDICE**.

(5)     Plaintiffs' State Law Claims (Doc. 15, ¶¶ 32–99) are **DISMISSED WITHOUT PREJUDICE**.

(6)     On or before July 10, 2017, Plaintiffs may file a second Amended Complaint in accordance with this Order.

(7)     Absent timely repleader, this action will be **CLOSED** without further notice.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on the 26th of June 2017.

ROY B. DALTON JR.
United States District Judge

Copies to:

Counsel of Record